#### IN THE UNITED STATES DISTRICT COURT FOR THE
#### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBORA L. WIGLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 09-CV-383-PJC ) |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) |

#### OPINION AND ORDER

Claimant, Debora L. Wigley ("Wigley"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Wigley's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wigley appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Wigley was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

#### Claimant's Background

At the time of the hearing before the ALJ on March 25, 2008, Wigley was 48 years old, was 5'1", and weighed 201 pounds. (R. 29). She had an eleventh grade education. (R. 31-32). She testified she was unable to work due to an inability to stand, walk, or stay awake for prolonged periods of time. (R. 32-33). She also testified to memory problems. *Id.*

Wigley had been employed as a machine operator for a plastic manufacturing company, and as a checker for a grocery store. (R. 46-47). It was late in her 11-year employment at the grocery store when she first experienced sleep disturbances as well as pain in her feet. (R. 47-48). Her boss made accommodations for her difficulties which included oversleeping and falling asleep while on the job. *Id.*

Wigley described inability to sleep at night, including nights when she got up every hour or two. (R. 32, 43). Symptoms of fatigue caused her to be tired all the time and to lack interest in activities. (R. 43-44). Fatigue, pain, and not feeling well made Wigley sleep "a lot" and stay in bed 3 days a week. (R. 46). Wigley testified that she fell asleep in the daytime 3 to 4 times daily for approximately 30 minutes at a time. (R.32). She fell asleep without warning while sitting or standing. *Id.* Wigley testified she had to stop cooking because she had once fallen asleep while doing so. (R. 32). Her daughter helped finish household chores she started, but became too tired to complete. *Id.*

Wigley testified that her daughter or husband helped with her grooming tasks because she was unable to raise her arm due to a cut nerve in her neck. (R. 49-50). Pain in her hands restricted her ability to handle objects or to lift items that weighed more than a gallon of milk. (R. 44). Two days a week she experienced a "good day" when she spent time with her family, fed the dogs, and tried to go for a walk. (R. 45). She experienced breathing problems and swelling in her feet which would limit her ability to walk past the length of a block. (R. 33-35, 41-42). In addition, painful feet left her unable to stand longer than 15 minutes. (R. 32-33, 41, 45-46).

Doctors advised Wigley to exercise, diet, and quit smoking cigarettes. (R. 33-35, 41-42). Over the treating history of Wigley's various medical conditions, she had been prescribed several narcolepsy medications, inhalers for shortness of breath, and "patches" to help her stop smoking.

*Id.* Wigley testified medications did not help with her narcoleptic symptoms. (R. 33, 35).

Wigley testified that she had been diagnosed with "mini-strokes" that caused problems with her memory, comprehension, and ability to read small print. (R. 33, 36-40).

Wigley's husband of 18 years testified at the hearing as to his wife's physical limitations and the effects on her life. (R. 51-58). He said that his family often ate out because his wife had difficulty with cooking and cleaning. (R. 52). Both he and his daughter helped with household chores due to his wife's inability to do them. *Id.* Wigley could only walk around the block due to swelling in her feet and shortness of breath. (R. 53-56). In describing Wigley's disrupted sleep patterns, he testified that he would awaken at 1:00 a.m. or 2:00 a.m. and Wigley would be staring out the windows. (R. 53). Wigley slept until noon or 1:00 p.m., or when she felt like getting up. *Id.* He had observed Wigley fall asleep suddenly once or twice during the course of a day. (R. 52-53).

Wigley initially established care from David R. Ring, D.O. on December 11, 1997 for complaints of fatigue and weight gain. (R. 317). During her appointment, she reported a history of chronic narcolepsy, rheumatoid arthritis, fatigue, and depression. *Id.* She reported a 28-year history of smoking cigarettes. *Id.* Wigley expressed frustration regarding treatment received by another physician for her symptoms of fatigue associated with her narcolepsy. *Id.* At her next appointment, apparently December 18, 1997, Wigley was upset and frustrated with continued daytime somnolence, difficulty waking in the morning, and difficulty staying awake. *Id.* In addition to narcolepsy, Dr. Ring found that Wigley experienced depression with severe anxiety, sadness, and frustration. *Id.*

During her January 7, 1998 follow-up appointment regarding her narcolepsy, Wigley reported tolerating Ritalin and Vivactil medications. (R. 315). She said they improved her ability to stay

awake. *Id.* At her next appointment, apparently on February 19, 1998, Wigley reported an increase in sleepiness and narcolepsy symptoms due to anxiety over a job situation. *Id.* Dr. Ring noted that improvement of Wigley's narcoleptic symptoms deteriorated under stressful conditions. *Id*. He refilled her prescriptions. *Id*. At her next appointment, Wigley presented to Dr. Ring for complaints of all over body pains, low grade fever, and chills. *Id.* Dr. Ring prescribed Lortab along with Levaquin for a possible diagnosis of rheumatoid disease, back pain, and diffuse musculoskeletal pain with leukocytosis. *Id.*

Wigley presented on May 14, 1998 with diffuse, non-specific muscular pain and knee pain. (R. 314). Dr. Ring's examination noted symmetric tenderness of a large portion of her muscular system. *Id.* She was prescribed Ultram for pain and a refill of Vivactil. *Id*. At her follow-up appointment on June 10, 1998, Wigley reported being "fair overall," and Dr. Ring prescribed her refills of Ritalin*. Id.*

Wigley was seen by Dr. Ring on June 24, 1998 with complaints of achiness, cough, shortness of breath, and wheezing. (R. 313). Dr. Ring determined she had bronchitis with asthma reaction, and he prescribed medication. *Id*. Dr. Ring diagnosed Wigley with asthma on July 30, 1998, when she had upper respiratory infection symptoms. *Id.* She was again prescribed medication, and Dr. Ring advised Wigley he wanted her to cease smoking. *Id.*

Improvement in Wigley's asthma was reported at her follow-up appointment of August 10, 1998. (R. 308). Dr. Ring scheduled pulmonary function tests for August 13, 1998. (R. 310-11). Test results were within normal limits, but with mild obstruction. *Id.* The second test with inhalation of Albuterol showed improvement of obstruction. *Id.*

Desire for weight loss and problems with narcolepsy brought Wigley to see Dr. Ring on November 3, 1999. (R. 303). Her weight was recorded as 188 pounds, with 120-135 pounds as her

4

ideal body weight. *Id.* Dr. Ring prescribed Xenical for weight loss. *Id.*

Wigley presented to Mayes County Medical Center Emergency on February 5, 2000, for complaints of shortness of breath. (R. 227-31). She had a non-productive cough, fever, and sweating. (R. 227). She was given a diagnosis of bronchitis and asthma and discharged with medications for the symptoms and given instruction not to smoke. (R. 229).

On February 7, 2000, Wigley presented to Dr. Ring's office with difficulty breathing, and she was told to return to the Emergency Room. (R. 303). Emergency room notes at Mayes County Medical Center state that she had shortness of breath, severe wheezing, cough, and chest tightness. (R. 181-85). Oxygen test results reported she had an oxygen saturation level of 92%, and chest x-rays found her lungs and heart were normal. (R. 165, 176-77). Out of concern for possible respiratory distress, Wigley was admitted to the Medical Center for asthma with acute exacerbation and dyspnea.[1] (R. 166-85). At the time of her admission, she reported to a several year history of mild to moderate difficulty with asthma; significant reflux symptoms; a history of smoking since age 12, with 1 to 1.5 pack per day in current use; and sleep disturbances. (R. 164, 166, 172, 187).

By February 10, 2000, with no improvement in symptoms, she was transferred via ambulance to Saint Francis Hospital in Tulsa for care by a pulmonary specialist. (R. 164-65, 187-215). At the time of her transfer, records indicate Wigley was in mild to moderate respiratory distress and was fatigued. (R. 211). She was observed with a high degree of shortness of breath, wheezing and bilateral lung crackles, and she had significant edema in her fingers and ankles. (R. 189, 211, 214). Her oxygen saturation level was 91-92%. (R. 189). Chest x-rays showed that her lungs had developed bilateral interstitial pulmonary infiltrates. (R. 202-05). Findings from CT scans of her

---

[1] Dyspnea is "[a]ir hunger resulting in labored or difficult breathing." Taber's Cyclopedic Medical Dictionary 593 (17th ed. 1993).

5

chest and doppler venous tests of both legs were negative for pulmonary embolism. (R. 200-01). Intravenous antibiotics and bronchodilator treatments were administered. *Id.* With improvement of symptoms, Wigley was discharged on February 15, 2000, with advice to follow-up with her primary care doctor and for subsequent chest-rays. (R. 187-88). Her discharge diagnoses were community-acquired pneumonia, etiology not established; asthma with acute exacerbation; gastroesophageal reflux disease; significant oral thrush and probable candida esophagitis; resolved hypertension; history of narcolepsy; and probable glucose intolerance. *Id.*

During her follow-up with Dr. Ring on April 26, 2000, Wigley reported diffuse pain in her feet, hands, ankles, and wrists. (R. 301). On exam, Dr. Ring found no swelling or synovitis in her joints. *Id.* Dr. Ring evaluated Wigley on May 9, 2000 for cough, congestion, and prolonged wheezing. *Id.* Though Wigley was not in distress, Dr. Ring noted concern that she might be experiencing a severe asthma reaction. *Id.* A regime of prednisone was started, with improvement noted on follow-up appointments on May 11 and May 25, 2000. *Id.* Dr. Ring encouraged Wigley to quit smoking. (R. 300).

After Wigley was seen by Dr. Ring on August 18, 2000 for pharyngitis and flu symptoms, she presented on August 30 with an egg-sized lymph node lump on the left side of her neck. *Id.* On examination, Dr. Ring diagnosed the condition as lymphadenopathy and referred her to an ear, nose, and throat specialist.

On October 31, 2000, Wigley was evaluated by Dr. Ring for symptoms of shortness of breath, lethargy, fatigue, and difficulty with attempts to lose weight. (R. 298). He made adjustment to Wigley's arthritis and asthma medications. *Id.* Cold and asthma symptoms brought Wigley into Dr. Ring's office on January 6, 2001. *Id.* Dr. Ring believed Wigley had possible bronchitis and exacerbated asthma. *Id.* She was provided prednisone and refill prescriptions for multiple

6

medications. *Id*. Wigley presented back to Dr. Ring on January 30, 2001 with cough, congestion, difficulty breathing, and fever. (R. 297). Dr. Ring questioned if she had viral syndrome versus bronchitis with exacerbation of asthma. *Id*. At a recheck on February 1, 2001, she had slow improvement of bronchitis and asthma symptoms. *Id.*

Dr. Ring saw Wigley on May 29, 2001 for a non-productive cough, depression, irritability, and narcolepsy. (R. 293). She informed him that she slept all the time, isolated herself, and had lost interest in participation of activities. *Id.* Dr. Ring assessed her with cough, congestion, asthma, narcolepsy, and depression. *Id.* Dr. Ring made adjustments to her medication and planned to switch the narcolepsy medication due to the potential for pulmonary hypertension with amphetamine use. *Id.* At the request of Dr. Ring, an echocardiograph study was conducted on June 11, 2001, for evaluation of Wigley for structural and valvular heart disease. (R. 296). Findings showed no significant valvular abnormalities of the heart's structure. *Id.*

On July 10, 2001, Wigley presented to Dr. Ring's office for pain in her legs, ankles, and arms. (R. 293). She was observed with moderate erythema and tenderness in ankles and wrists. *Id*. She had full range of motion. *Id.* Diagnosis was acute exacerbation of arthritis. *Id.* Pain medication and steroid medication were prescribed, but a notation was made that Wigley might not fill the steroid medication. *Id.* Later in the day, Wigley presented to the Emergency Room at Mayes County Medical Center for similar bilateral pains in arms and ankles. (R. 221-26). Records reflect that she had a depressed affect and paced the room. (R. 222). She was diagnosed with a rheumatoid arthritis flare-up and given medications for pain and inflammation. (R. 222-23, 225). On discharge that day, she was instructed to see her doctor or a rheumatologist. (R. 223).

Wigley reported to Dr. Ring on August 20, 2001 with symptoms of severe daytime somnolence, reporting that her medication, Provigil, was no longer working. (R. 292). Dr. Ring

7

referred Wigley to a sleep specialist, Dr. Bregman. *Id.*

Dr. Ring saw Wigley on September 10, 2001, for pains in her wrists, elbows, knees, and shoulders. *Id.* She was observed with mildly swollen hands and increased temperature in left elbow. *Id.* Dr. Ring assessed Wigley with arthralgia in the pattern of inflammatory arthritis and prescribed medications. *Id.* Dr. Ring diagnosed Wigley with Bell's palsy on December 10, 2001 for paralysis in her right eyelid and face. *Id.* She declined treatment with steroids, because she felt she had a poor tolerance for them. *Id.*

By referral from Dr. Ring, an overnight neurodiagnostic polysomnogram sleep study was performed by Richard Bregman, M.D., at Saint Francis Hospital on January 28, 2002. (R. 243-44). Test results indicated Wigley had mild obstructive sleep apnea syndrome. *Id.* Dr. Bregman recommended Wigley use Adderall for narcoleptic symptoms. *Id.*

Symptoms of a cough, achiness, and fever brought Wigley to Dr. Ring on March 27, 2002. (R. 290). She had wheezing on prolonged expiratory breath. *Id.* Chest x-rays were negative. *Id.* Administered breathing treatments helped. *Id.* The diagnosis was viral syndrome versus pneumonia with exacerbation of asthma, and Dr. Ring prescribed medications. *Id.*

On May 6, 2002, Wigley presented to the emergency room at Saint Francis Hospital in Tulsa for complaints of asthma and acute bronchitis. (R 240-41). Chest x-rays and a CT scan with contrast showed no acute disease or abnormality and her heart and lung structures were normal. *Id.* It was concluded that Wigley had mild bronchiectasis. (R. 238, 241).

Wigley was seen by Dr. Ring on November 11, 2002 for arthritic and abdominal pain. (R. 287). Dr. Ring prescribed medications for her arthralgias and gastroenteritis symptoms. *Id.* Dr. Ring diagnosed Wigley on December 16, 2002 with exacerbation of asthma due to symptoms of a non-productive cough and congestion. *Id.* Wigley declined his recommendation of oral steroids,

8

and she was provided other medications. *Id.*

Complaints of arm and hand pain brought Wigley for evaluation with John Fell, D.O., another physician in Dr. Ring's office, on May 27, 2003. (R. 286). Wigley requested Vicoprofen pain medication, as she reported a need for stronger pain relief. *Id*. Dr. Fell noted mild swelling and believed a slight deformity in Wigley's hands was possibly Heberden's nodules.[2] *Id.* He ordered blood work to check for possible rheumatoid arthritis and prescribed Vicoprofen for pain. *Id.*

Medical records reflect Wigley maintained contact with Dr. Ring from October 6, 2003 through July 29, 2004 to obtain refills for asthma medications. *Id.* She presented on August 26, 2004 with complaints of congestion, intermittent cough, diffuse wheezing, and shortness of breath. (R. 285). Wigley continued cigarette use. *Id.* Dr. Fell diagnosed her with bronchitis and acute exacerbation of asthma. *Id.* Wigley expressed reluctance to follow Dr. Fell's recommendation for systemic steroids, and instead opted to double-up on use of a Flovent inhaler. *Id.*

Dr. Ring evaluated Wigley on October 26, 2004 for follow-up of hypertension, chronic insomnia, and injury to her arm from falling. *Id.* Wigley requested antihypertensive therapy and a prescription for a sleep aid. *Id.* Dr. Ring diagnosed her with a right arm contusion and hematoma, hypertension, and insomnia. *Id.* She was provided prescriptions for sleep and hypertension. *Id*. Dr. Ring's January 26, 2005 appointment notes reflect that he had "a long discussion" with Wigley concerning her noncompliance with hypertension therapy and her uncontrolled hypertension. (R. 282). He assessed Wigley with an "overwhelming risk of cardiovascular disease due to hypertension, obesity, strong family history and smoking." *Id.* Dr. Ring prescribed and refilled

---

[2] Heberden's nodes are "[h]ard nodules or enlargements of tubercles of last phalanges of fingers; seen in osteoarthritis." Taber's Cyclopedic Medical Dictionary 862 (17th ed. 1993).

9

medications. *Id.* During a scheduled February 23, 2005 recheck, Wigley presented with hypertension and a chronic cough. (R. 278). She reported compliance with her hypertension medication, and Dr. Ring described Wigley's asthma as "fairly well-controlled." *Id.*

Dr. Fell saw Wigley on March 3, 2005 for head and chest congestion, body aches, chills, and sore throat. (R. 276). She reported continued cigarette smoking. *Id.* Dr. Fell diagnosed her with acute bronchitis, well-controlled hypertension, and moderate persistent asthma, and he prescribed medications. *Id.* That evening, Wigley presented to the Saint Francis Emergency Room with a complaint of breathing difficulty. (R. 233-39). In addition to shortness of breath, she had a dry, non-productive cough. (R. 234). X-rays of her heart, lung, and mediastinal structures were unremarkable and without abnormality. (R. 238-39). She was released with a diagnosis of exacerbated asthma, and she was instructed to continue the regime of medications that Dr. Fell previously prescribed. (R. 237). Wigley presented back to Dr. Ring on March 11, 2005 with continued asthma and allergies problems, and Dr. Ring prescribed medication. (R. 276).

On October 19, 2005, Wigley presented to Dr. Ring with complaints of cough and congestion. (R. 274). Dr. Ring observed shortness of breath, diffuse wheezing, and coughing. *Id.* Wigley was diagnosed with myalgias, arthralgias, cough, and congestion, and she was prescribed medication. Dr. Ring saw Wigley on November 11, 2005 for a complaint of intermittent, severe, sharp pain behind her right ear. *Id.* Dr. Ring believed the pain was a type of neuralgia and prescribed medication. *Id.* Dr. Ring noted Wigley had a slight cough, but had no other respiratory symptoms. *Id.*

On April 11, 2006, Wigley saw Dr. Ring for problems with narcolepsy, asthma, cough, and shortness of breath. (R. 271). In the section for the history of the present illness, Dr. Ring stated that Wigley was not doing well, and he noted her "chronic history of narcolepsy." *Id.* He stated that

10

Wigley quit taking stimulants because they seemed to be ineffective. *Id.* He stated that Wigley could not work because she was hypersomnolent, and he noted that Wigley was pursuing Social Security disability benefits. *Id.* Dr. Ring assessed Wigley with asthma with some degree of exacerbation, and "[n]arcolepsy with chronic persistent symptoms which are disabling for the patient." *Id.* He noted Wigley's history of arthritis, including treatment by a rheumatologist. *Id.*

Dr. Ring saw Wigley on May 30, 2006 for a follow-up of her narcolepsy, chronic back, hand, and foot pain, asthma, and continued smoking. (R. 265). In the section for the history of the present illness, Dr. Ring again noted Wigley's Social Security disability application and reported that he completed forms for her. *Id.* He stated that Wigley could not "perform very many tasks due to her chronic somnolence." *Id.* He again noted that treatment with stimulants had been discontinued due to ineffectiveness. *Id.* He noted Wigley's chronic hand and foot pain and her previous evaluation by a rheumatologist. *Id.* He noted Wigley's complaints of lower back pain which limited her ability to move. *Id.* Dr. Ring assessed Wigley with narcolepsy, asthma, continued smoking, arthralgias of undetermined etiology in her hands and feet, and low back pain. *Id.* Dr. Ring ordered a series of blood tests and x-rays to diagnose Wigley's physical problems. *Id.* Subsequent results of the June 1, 2006 test reports were: negative rheumatoid factor of <20.0; negative readings of chest, spine, hand and foot joints x-rays; and sed rate count of 34 mm/hr. (R 267-68, 270).

Wigley saw Dr. Ring on December 5, 2006 with problems with hypertension, chronic dyspnea, narcolepsy, chronic fatigue, heel pain and back pain. (R. 322). She was hypertensive at the appointment, and she reported that she had not been taking her medication due to an inability to afford it. *Id.* Dr. Ring noted several spirometry tests had showed some degree of obstruction that would not be considered severe, but he discussed smoking cessation at length. *Id.* On examination of Wigley's upper back, he found tenderness and limited range of motion. *Id.* He found some

11

tenderness of her heels and some cyanosis of her toes. *Id.* Dr. Ring's assessments were hypertension, not adequately treated; narcolepsy by history; asthma; chronic smoking with possible chronic obstructive pulmonary disease ("COPD"); cyanosis of the toes; bilateral plantar fasciitis; and upper back pain. *Id.* He prescribed medications. *Id.*

Dr. Ring saw Wigley on January 2, 2007 for upper respiratory congestion and cough. *Id.* She had a chronic cough and wheezing due to asthma and continued cigarette smoking. *Id.* Dr. Ring prescribed medication for an upper respiratory infection and bronchitis. *Id.*

Wigley presented to Dr. Ring on January 22, 2007 after having onset of slurred speech the night before and finding when she arrived at the doctor's office that she had difficulty signing her name. (R. 321). Dr. Ring believed that Wigley had experienced a "significant neurologic event," and Wigley was very hypertensive. *Id.* Dr. Ring believed that Wigley had an acute cerebrovascular accident, probably ischemic. *Id.* Dr. Ring referred her for several tests. *Id.* February 5, 2007 echocardiogram and carotid doppler ultrasound test results were negative. *Id.* However Dr. Ring's records note that the results of Wigley's February 9, 2007 MRI report indicated a probable stroke, but Dr. Ring referred Wigley to a neurologist for further follow-up. *Id.*

Richard T. Knepper, M.D., authored the radiology report of the MRI brain study of February 9, 2007. (R. 333). The impression was:

> Considerations for assessment of a paraventricular, large, demyelinating process involving the mid posterior limb of the right internal capsule includes a subacute ischemic infarct versus an MS plaque. There is no mass effect, and a tumor is, I think, somewhat unlikely. A double dose enhanced study, I think might be of value, particularly to see if there are other potential plaques of MS.

*Id.*

At the referral by Dr. Ring, Wigley was seen for follow-up of her stroke symptoms by Timothy Young, M.D., of Neurological Associates of Tulsa, on November 19, 2007. (R. 323-25).

Dr. Young's notes reflect he evaluated Wigley without presence of detailed medical tests or records related to Wigley's account of the January 2007 right hemisphere stroke. *Id.* Dr. Young made a recommendation that Wigley undergo another sleep study to determine the degree of obstructive sleep apnea, and he wanted to obtain the results from the tests she had previously undergone. (R 325).

Wigley presented to Dr. Ring on January 11, 2008 for symptoms of depression which included crying and lack of motivation to do normal activities. (R. 319). She also complained of a painful growth on her left fourth toe. *Id.* On examination, Dr. Ring stated purplish discoloration of Wigley's toes suggested "some degree of ischemia."[3] *Id.* Wigley was scheduled to see a podiatrist to treat the hyperkeratotic lesion of her toe. *Id.*

After the ALJ's decision, Wigley's attorneys submitted a radiology report of Dr. Knepper interpreting a CT scan of Wigley's brain performed on December 5, 2008. (R. 355). The indication for the test was stated as dizziness and possible stroke. *Id.* Dr. Knepper's impression was that there was "a lacunar infarct[4] involving the internal capsule on the right high parietal area, unusual for the patient's age." *Id.*

Agency consultant Beau C. Jennings, D.O. examined Wigley on August 31, 2005. (R. 252-64). For Wigley's reasons for disability, Dr. Jennings summarized Wigley's complaints of narcolepsy, pain in her hands, knees, ankles, and back, and shortness of breath. (R. 252).

---

[3] Ischemia is "[l]ocal and temporary deficiency of blood supply due to obstruction of the circulation to a part." Taber's Cyclopedic Medical Dictionary 1024 (17th ed. 1993).

[4] A lacunar infarct is a small lesion in the brain caused by a deficiency of blood circulation to the area. *Sims v. Barnhart*, 309 F.3d 424, 426, n.1 (7th Cir. 2002), *citing* W.B. Saunders Co., *Dorland's Illustrated Medical Dictionary* 894-95, 956 (29th ed. 2000).

Examination showed no significant findings. (R. 252-53). Dr. Jennings' assessments were obesity, chronic arthralgias, narcolepsy by history, and chronic shortness of breath. (R. 253). The range of motion charts attached to Dr. Jennings' report showed normal range of motion for all of Wigley's joints. (R. 260-61). Dr. Jennings did not complete the range of motion portion of the hand/wrist sheet, but stated that Wigley could oppose her fingers and thumb, manipulate small objects, and effectively grasp tools. (R. 262). The back sheet showed that Wigley's walking was normal, straight leg raising was negative, and leg strength was normal. (R. 263).

## Procedural History

Wigley protectively filed an application on May 5, 2005 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*, alleging disability beginning May 27, 1999. (R. 98-100). The application was denied initially and on reconsideration. (R. 82-84, 86-89). A hearing before ALJ John W. Belcher was held March 25, 2008 in Miami, Oklahoma. (R. 25-63). By decision dated April 23, 2008, the ALJ found that Wigley was not disabled at any time through the date of the decision. (R. 16-24). On May 11, 2009, the Appeals Council denied review of the ALJ's findings. (R. 4-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Wigley met insured status requirements through December 31, 2004. (R. 18). At Step One, the ALJ found that Wigley had not engaged in any substantial gainful activity since her alleged onset date of May 27, 1999. *Id.* At Step Two, the ALJ found that Wigley had severe impairments of narcolepsy, asthma, sleep apnea, and obesity. *Id.* The ALJ discussed the alleged impairment of Bell's palsy, and stated that this was not a severe impairment. *Id.* He determined that Wigley's complaints of pain in her hands, feet, and low back were medically nondeterminable. *Id.* At Step Three, the ALJ found that Wigley's impairments did not meet a Listing. *Id.*

The ALJ determined that Wigley had the RFC to do light work with some nonexertional limitations. (R. 18-19). Wigley could only occasionally climb stairs, bend, stoop, crouch, crawl or kneel, and she could never climb ladders, ropes, or scaffolds, and she could never balance. *Id.* In addition, Wigley needed an air-conditioned environment, and she needed to avoid extreme cold and heat, fumes, odors, dusts, toxins, gases, and pools of water. (R. 19). At Step Four, the ALJ found that Wigley could perform her past relevant work as data entry clerk. (R. 23). Therefore, the ALJ found that Wigley was not disabled at any time from May 27, 1999 through the date of his decision. (R. 24).

## Review

While Wigley raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Wigley's treating physician, Dr. Ring. Because reversal is required based on this issue, the other issues Wigley raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

In the present case, the ALJ reviewed the treating evidence from 1999 through 2004. (R. 20-22). Because the ALJ noted that Wigley was required to establish disability prior to December 31, 2004, her dated last insured, presumably the ALJ stopped discussing the medical evidence after that date because it was outside of the relevant period.[6]

The problem with the ALJ's approach is that, while Dr. Ring's opinion evidence was given

---

[6]The ALJ does not explicitly give this as an explanation, and his decision is not completely consistent with this. For example, in reviewing Wigley's testimony, he noted that she said that she had a stroke in January 2007, and he found that a stroke was not "well demonstrated" by the MRI done at that time. (R. 19). To be consistent, it would seem that he should not have discussed this evidence, but should have dismissed it as irrelevant because it was outside the applicable time period.

in 2006, more than a year after Wigley's date last insured, his opinions discussed Wigley's "chronic" medical problems. (R. 265, 271). Thus, this is not an instance in which a new condition was diagnosed in 2006 when the relevant time period ended in 2004. Instead, this is an instance when the treating physician's opinions are contained in treatment notes in 2006, but they arguably refer to the claimant's chronic conditions that were in existence and were being treated during the relevant period. On April 11, 2006, Wigley saw Dr. Ring for problems with narcolepsy, asthma, cough, and shortness of breath. (R. 271). Dr. Ring stated that Wigley was not doing well, he noted her "chronic history of narcolepsy," and he stated that Wigley could not work because she was hypersomnolent. *Id.* Dr. Ring's assessment included "[n]arcolepsy with chronic persistent symptoms which are disabling for the patient." *Id.* Dr. Ring saw Wigley on May 30, 2006 for a follow-up of her narcolepsy, chronic back, hand, and foot pain, asthma, and continued smoking. (R. 265). Dr. Ring stated that Wigley could not "perform very many tasks due to her chronic somnolence." *Id.* It is the opinion of the undersigned that the statements made by Dr. Ring on these two occasions in 2006 were treating physician medical opinions that were required to be discussed and analyzed by the ALJ. *See Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) ("true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform").

The obligation of the ALJ to discuss the opinion evidence of Dr. Ring from 2006, even though the relevant period closed in 2004, is illustrated by the Tenth Circuit's discussion in an unpublished case, *Andersen v. Astrue*, 319 Fed. Appx. 712 (10th Cir. 2009) (unpublished). In *Andersen*, the claimant's insured status expired in 1998, and two of his treating physicians gave opinion evidence in 1999 and 2000 regarding the scope of his impairments. *Id.* at 716, 726-29. The

18

Tenth Circuit found that the ALJ did not sufficiently discuss the treating physician opinion evidence and did not give legitimate reasons for discounting them. *Id.* at 726-29. The ALJ's reason that the opinions were given outside of the relevant time period was not a specific legitimate reason due to the nature of the opinion evidence. The opinions did not diagnose a new condition outside of the relevant period, but instead gave evidence of the scope of the impairment, which had been diagnosed within the relevant period. *Id. See also Hamlin*, 365 F.3d at 1215-21 (discussing the insufficiencies of the ALJ's discussion of treating physician opinion evidence relating to different time periods).

Here, the ALJ did not mention the opinions of Dr. Ring, and in his decision he even stated that the record did not "contain any opinions from treating or examining physicians indicating that the claimant is disabled or that she even has limitations greater than those determined in this decision." (R. 23). Again, presumably the ALJ omitted any discussion of the opinions of Dr. Ring because they were not given until after the relevant period, and presumably his statement regarding treating physician opinions was meant to state that there were no opinions during the relevant period, but both of these are presumptions, not specific findings that can be reviewed by this Court. *Langley*, 373 F.3d at 1122-23 (ALJ's reasons for rejecting a treating physician opinion must be "sufficiently specific to enable [the court] to meaningfully review his findings."). The ALJ was required to discuss the opinion evidence of Dr. Ring, even though the opinions were included in 2006 treatment notes, especially given the nature of Dr. Ring's opinions, in that he explicitly referred to the chronic nature of Wigley's narcolepsy in stating that it was disabling. According to the Tenth Circuit's guidance in the unreported case of *Andersen*, as discussed above, on remand the ALJ must given specific legitimate reasons for rejecting or discounting the opinions of Dr. Ring, and those reasons must go beyond the fact that the opinions were given outside of the relevant period.

Thus, this case must be remanded so that the ALJ can properly consider the opinion evidence

of Dr. Ring.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to the treating physician opinion evidence requires reversal, the undersigned does not address the remaining contentions of Wigley. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Wigley.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 30th day of August, 2010

Paul J. Cleary
United States Magistrate Judge